MARY THOMAS STUBBLEFIELD v. STATE

No. 31,507. February 24, 1960

Motion for Rehearing Overruled April 6, 1960

*W. E. Martin*, Houston, for appellant.

*Dan Walton*, District Attorney, *Samuel H. Robertson, Jr., Neil McKay*, Assistants District Attorney, Houston, and *Leon Douglas*, State's Attorney, Austin, for the state.

WOODLEY, Judge.

The offense is murder; the punishment, 15 years.

The deceased, Lilborn Tilson, and his wife operated a beer tavern in Houston.

At one A.M. on the night of March 20, 1954, Tilson closed his place of business and drove to his home with the money he took from his cash register. Some of the money was in bills, which he had in his pocket. The change was in a sack.

Shots from a small caliber gun were heard by neighbors and Tilson was found lying at the side of his automobile parked in his driveway. He died shortly thereafter from the effect of gunshot wounds in his body.

Bullet holes were found in the wall of the front porch of Tilson's home and in his automobile. Some $300.00 in bills were in his pocket and a few cents in change was found on the ground.

The killing remained an unsolved murder until appellant appeared at the sheriff's ofice in Midland, Texas, in July 1958, and said "that she and a fellow by the name of Cummings had pulled a hijacking job of a beer tavern in Houston, and this Lib Tilson was killed and she said he was a good man and didn't deserve to be killed, and she wanted to get it off her conscience"; "that she was living in Dallas with Bill Cummings, and that they had to have some money for doctors and hospitals. So he asked her where he could come to Houston and hold up a place where they might raise some fast money, and she told me after that they left Dallas and drove to Houston, and they got here about mid-night, and she carried him to Lib Tilson's house, or in that vicinity, right around the corner, she said.

"Q. She carried Cummings there? A. Yes, they were in the car, and she showed him where to go, if I recall what she told me right, and she said she sat in the car, while Cummings went to the house to wait for Mr. Tilson, and she said after awhile he came back running and she had heard some shots, and he said he had run into a tree and he had a gash on his forehead.

"Q. When you said 'he' you are speaking of Cummings? A. Yes, sir, and they drove back to Dallas. She said they threw the gun out on 75, highway 75, at one of those underpasses.

"Q. All right, did she say anything with reference to any money they might or might not have obtained? A. Yes, sir,

she said they had some forty or fifty dollars in money in a sack.

"Q. Did she say anything with reference to who pointed out the place? A. She said that she did."

Officers from Houston arrived the next day and appellant signed a written confession which, eliminating certain portions which were objected to, was offered in evidence. It reads in part: "I was still sick and needed to go to the hospital and we were broke. Bill asked me if I knew of any of the bars in Houston that had any money in them that he could holdup. * * * Bill had a small pistol that I think was a .22 caliber and he had got this gun when he burglarized the O'Neal's Delivery Service there in Dallas, Texas, a couple of months earlier. We got in Bill's car, which was a 1941 Green Pontiac Sedan and headed for Houston and Bill was driving. * * * I do remember that it was night time and Bill parked the car on a side street near an alley behind Lib Tilson's house. I don't remember the name of this side street but it crosses 26th St. and 27th St. and runs in a north and south direction. Bill got out of the car and told me to wait for him so I waited in the car and Bill Cummings walked down this alleyway towards Lib Tilson's house. I think that Bill was going to get in Lib's house and wait on him to come home and then rob him. I don't know how long I sat in the car but after awhile I heard four shots and then I saw Bill running towards the car and he was carrying a money sack in his hand. He jumped in the car on the passenger side and I saw that his forehead was bleeding. I asked him what happened and he said that he didn't get in the house because of Lib's dog so he waited outside for him. * * * I was driving the car when we left out of there and we headed out North Shepherd Dr. towards Highway No. 75 to go back to Dallas. When we got to the North Shepherd Underpass at Highway No. 75 across from the Chuck Wagon Bar I stopped the car and Bill throwed the gun out underneath this underpass. We then drove straight on to Dallas, Texas, and went home. We were both pretty scared and when we got to our house Bill opened the money sack and there was about thirty dollars in silver in it. Bill told me not to mention this to anyone not even him. * * * I have never been able to forget about Bill Cummings robbing and shooting Lib Tilson four years ago and it has been on my mind constantly since then."

Cummings, who was jointly indicted with appellant for the

murder of Tilson, and whose case had been disposed of, testified as a witness for the state. Referring to appellant he testified:

"Q. Tell us what she said? A. She told me she knew he carried quite a bit of money.

"Q. Was there anything else she told you? A. She showed me where he lived and showed me where his place of business was.

"Q. Now, how did you come from Dallas to Houston? A. In a car.

"Q. Was it your car? A. Yes, sir * * * .

"Q. Before you came to Houston that day did you know where Tilson's residence was? A. No, sir.

"Q. Who directed you, if anybody did, to his residence? A. Mary * * * .

"Q. I believe you said you parked around the corner from Tilson's house about one or one-thirty in the morning? A. Yes, sir.

"Q. Now, you say 'we', is that you and this defendant? A. Yes, sir.

"Q. All right, what happened then? A. I got out of the car and went up to the house and waited until he came * * * .

"Q. Where did you wait at the home? A. There is a brick pillar—I imagine it is part of the porch.

"Q. One of those brick pillars that the porch rests on to keep it from falling down? A. Yes, sir.

"Q. All right, did he come home? A. Yes.

"Q. How long did you wait up there William until he came home? A. Approximately thirty minutes.

"Q. If you will, tell us what happened when he came home? A. Well, he got out of his car and he walked up on the porch and started to open the door and I told him—I stepped

out from behind the pillar and told him: 'This is a holdup.' And he dropped the money bag he was holding in his hands and turned towards me and started toward me and said: 'I will show you, you little so and so'; and I turned and *run* and hit a tree as I was coming off the porch, and I started to pull the trigger.

"Q. Do you recall how many times you shot? A. I don't.

"Q. What sort of a gun was it, William? A. It was a .22 revolver.

"Q. And where was Mary Stubblefield all of this time? A. In the car.

"Q. That is in your car parked around the corner? A. Yes, sir.

"Q. All right, what did you do after you shot? A. Then I started off, and I thought about the money, and I *run* back to the porch and got the money bag and *run* back to the car.

"Q. Which street do you recall you ran down? A. 26th.

"Q. That is the street in front of Tilson's house? A. Yes, sir.

"Q. Where was Mary at that time? A. In the car.

"Q. Was she * * * what part of the car was she sitting in? A. She was in the driver's position.

"Q. Sitting under the steering wheel? A. Yes, sir.

"Q. And when you came * * * when you got back to the car was the motor running or not? A. Yes, sir, it was.

"Q. It was not running when you left? A. No, sir.

"Q. But it was running when you came back? A. Yes, sir.

"Q. Then what did you do? A. I got in the car and then she started.

"Q. Started to drive off? A. Yes, sir.

"Q. Where did you go? A. To Dallas.

Q. All right, what did you do, if anything, with the gun? A. Throwed it underneath an underpass at Shepherd and highway 75.

" Q. What, if anything, did you do with the money and the sack it was in? A. I spent it."

Appellant testified in part:

"Q. And at that time the car was parked there and you were left in it and where did Mr. Cummings say he was going and what did he say he was going to do? A. He said he was going to try to get in the house before they got home and hide and wait until they went to sleep and then take his money * * * .

"Q. Did you know or did he tell you that he intended to rob Mr. Tilson with a firearm? A. No.

"Q. What did he tell you he intended to do? A. He said he was going to get inside the house before Mr. Tilson came home and hide and then *rob him after he went to sleep.*

"Q. Now, when he came back after the thing was over and after you got away from there did he tell you whether he did get in the house or whether he didn't? A. Yes, he said he couldn't get in the house because the dog had barked or something like that or the dog was in the house, I don't know what he meant and then he said he had waited outside for him, and robbed him * * * .

"Q. Had you ever helped him do any of these other burglaries or other things he had done? A. I stayed in the car.

Q. Were you keeping watch for him or waiting while he went and did it and came back? A. No, he always said he didn't want me near there.

"Q. He always said what? A. He didn't want me near the place."

On cross-examination she testified, in part:

"Q. And you knew he had a .22 caliber pistol, didn't you? A. Yes * * * .

"Q. You knew what he was going to do didn't you, Mary, when he got out of the car and went down there? A. I didn't know he was going to hold him up.

"Q. You knew he was going to rob him, didn't you? A. After he went to sleep.

"Q. And you were going to wait there in the car, weren't you? A. Yes.

"Q. While he went and robbed Tilson? A. Yes.

"Q. And you were going to leave with him, weren't you? A. Yes.

"Q. In fact just as you told the officers you did show Bill Cummings where Lib Tilson lived, didn't you? A. Mr. McKay, I don't know how it come about. That is the only way it could have been."

The evidence shows that the front porch, yard and driveway of the Tilson residence, where the shooting occurred, could not be seen from the place around the corner where appellant was waiting in the automobile.

The principal ground for reversal is that the evidence raised the issue, if it did not establish that appellant was an accomplice to the murder and not a principal, and the trial court erred in failing to instruct the jury regarding the law of accomplices and failing to submit the issue of her being an accomplice as an affirmative defense.

What we consider to be a complete answer to appellant's contention lies in the fact that appellant was present when the murder was committed. It was not necessary that she be in immediate contact with Cummings or that she be so situated at the time as to make her an eye or an ear witness. She was present in the sense of being immediately at hand and in the performance of her part of the planned unlawful act, a reasonable consequence of which was the murder of the man they had planned to rob. White v. State, 154 Tex. Cr. R. 489, 228 S.W. 2d 165, 170; Hill v. State, 135 Tex. Cr. R. 567, 121 S.W. 2d 996.

It was not necessary that the intention to kill be shown to be a part of the original design. Branch's Ann. P.C. 2d, Sec. 719.

The testimony of appellant at the trial suggesting that the plan was for Cummings to enter the home of Tilson and take his money after he went to sleep does not alter the situation. She knew that he was armed with a pistol and planned to take Tilson's money. The killing was a natural and probable consequence of the common plan and design. The evidence of the state and of the defense shows that appellant, who had selected the victim and agreed that Cummings would take his money with a pistol, was performing her part while waiting in Cummings' automobile to drive him back to Dallas with the fruits of the robbery.

The judgment is affirmed.

### ON MOTION FOR REHEARING

MORRISON, Presiding Judge.

Appellant again urges the contention that the facts raised an issue as to whether she was an accomplice or a principal and that the trial court erred in failing to submit such question to the jury. In our original opinion, we cited, but did not elaborate on, the holdings of this court in White and Hill. In each of such cases, this court was careful to point out what constituted "presence" and, in facts as near as could be found to the facts before us here, held that the accused was present at the time of the commission of the offense and was therefore a principal. In the relatively recent case of Schwartz v. State, 158 Tex. Cr. Rep. 171, 246 S. W. 2d 174, we had occasion on rehearing to spell out the facts which there made the accused an accomplice rather than a principal. After careful reconsideration, we have concluded that the facts before us here are on all fours with White and Hill and diametrically opposed to those in Schwartz.

Remaining convinced that we properly disposed of this cause originally, appellant's motion for rehearing is overruled.